**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| BRIAN HAUGER, individually and on behalf of all others similarly situated, | \| <br> \| <br> \| |
| Plaintiffs, | \| <br> \| |
| v. | \|  Civil Action Case No. <br> \|  1:25-cv-01058-VMC |
| SDWC FINANCIAL, LLC, a Florida limited liability corporation, and MEREDITH BRUCE, a Georgia individual, | \| <br> \| <br> \| <br> \| |
| Defendants. | \| <br> \| |

**AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Brian Hauger, individually and on behalf of all others similarly situated, by and through their undersigned attorneys, file this Amended Class Action Complaint against Defendants SDWC FINANCIAL, LLC, a Florida limited liability corporation with its principal place of business in Georgia, and MEREDITH BRUCE, a Georgia individual. Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes but is not limited to: (a) Documents filed in *SEC v. DRIVE PLANNING et. al.,* Northern District of Georgia 1:24-cv-03583-VMC; (b) Documents obtained by Plaintiff and other putative class members from Defendants; (c) Documents and sales materials produced to the public at large when Drive Planning was selling investments; and (d) Review of other publicly available information concerning Defendants.

1

# I. **INTRODUCTION**

1.    More than 2,000 investors from Georgia and elsewhere were victimized by a Ponzi scheme under which they were induced and encouraged to invest large sums of money with a promised return of ten percent interest every three months. Investors were urged to use whatever money they had, including their savings, retirement accounts, 529 college plans, and open lines of credit to participate in what, unbeknownst to them, was a fraudulent scheme.[1]

2.    The Ponzi scheme was orchestrated and carried out by Drive Planning, LLC ("Drive Planning") and its founder, Russell Todd Burkhalter ("Burkhalter"), both of whom have recently been charged by the Securities and Exchange Commission ("SEC") with originating and engaging in a $300 million Ponzi scheme that defrauded over 2,000 investors. According to the SEC's complaint, filed in the U.S. District Court for the Northern District of Georgia, Drive Planning and Burkhalter lured investors with promises of lucrative returns through purported real estate investments which in reality were unregistered securities in the form of Real Estate Acceleration Loans (REAL). *See SEC v. Drive Planning, LLC and Russell Todd Burkhalter,* No. 1-24-03583 (N.D. GA, filed August 2024) (aka "SEC Action").

3.    Defendants herein, SDWC FINANCIAL ("SDWC"), a financial advisor/wealth management firm, and MEREDITH BRUCE ("Bruce"), a Senior Financial Analysis employed by SDWC, recommended that the Plaintiff and countless others invest in Drive Planning, ignoring their risk-tolerance and causing them to lose large sums of money. As alleged in the SEC complaint, Burkhalter actually used the unsuspecting investors' funds to pay earlier investors and to finance his own extravagant lifestyle, including purchasing a multimillion-dollar

---

[1] This Amended Complaint is identical in all allegations and exhibits to the original Complaint filed on February 28, 2025 (DE 1), with the sole amendment being the addition of Exhibit L, the Certification of Brian Hauger.

yacht, luxury cars, and private jets. Defendants were aware, or should have been aware, that their investors' money was unsecured and that the investment vehicle was nothing more than a massive scheme to defraud. Burkhalter and Drive Planning are not named in this action because of a pending injunction that prohibits actions against them by investors in the pending SEC Action.

4.   Plaintiff brings this action on behalf of himself and a proposed class of investors to recover funds misused, commingled, and stolen by Burkhalter and Drive Planning on the direct recommendations of Defendants SDWC and BRUCE.

## II.    PARTIES

5.   Plaintiff, BRIAN HAUGER ("Hauger") is a citizen of Georgia and domiciled in Georgia.

6.    Defendant SDWC is a Florida limited liability company whose primary place of business is 1650 Grandwood Circle NW, Acworth, GA 30101.

## III.    JURISDICTION AND VENUE

7.   This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 78a, 28 U.S.C. § 1331, and 28 U.S.C. § 1367(a).

8.   Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2) because all defendants are residents of or located in the State of Georgia and a substantial part of the events or omissions giving rise to Plaintiff Investors' claims occurred in this District.

## IV.    FACTS COMMON TO ALL COUNTS

**The Beginnings of the Ponzi Scheme**

9.      In 2020, Drive Planning began offering to the public what it described in promotional materials as a "bridge loan opportunity promising 10% in 3 months." Burkhalter named the investment vehicle "REAL" (an acronym for "Real Estate Acceleration Loan").

10.      On September 22, 2020, Drive Planning received and deposited a check for $50,000 from the first REAL investor into a Drive Planning bank account. From September 22, 2020, to October 13, 2020, the account only received one additional deposit in the amount of $6.

11.      On October 13, 2020, Drive Planning transferred $112,000 out of that account to a self-directed IRA. Of this total, $90,671 in funds (the beginning Truist balance and the $6 deposit) were unrelated to REAL investments. This means that the self-directed IRA transfer included at least $21,329 of REAL investment funds.

12.      The self-directed IRA that received the $112,000 transfer, including funds from the first REAL investor, was for the benefit of an individual who had invested in a previous "energy" investment offered by Drive Planning. The terms of that investment called for principal and fixed return to be paid in October 2020.

**The Expansion of the Ponzi Scheme**

14.  Beyond the REAL promotional materials and other website content, Burkhalter and Drive Planning increased the inflow of cash from REAL investors by recruiting and paying sales agents, identified as "financial consultants" on the Drive Planning website.

15.  Burkhalter and Drive Planning paid sales agents, including SDWC and Bruce, a four percent commission on each REAL investment he or she sold, including on amounts that investors chose to "rollover" into a new 90-day investment. They further motivated sales agents by creating two clubs for top sales performers: The Presidents Club and the Chairman's Council.

Entry into the clubs required selling a certain amount of Drive Planning products, including REAL.

16.     Sales of $2,500,000 entitled the sales agent to membership in the President's Club. Sales of $4,500,000 entitled the sales agent to membership in the Chairman's Council. Membership in each group entitled the sales agent to an all-expense-paid trip for two to destinations including Toronto, Cabo San Lucas, and the Greek Isles.

17.     The sales plan worked. Drive Planning's master spreadsheet ("Spreadsheet"), on which it tracked investments, withdrawals, and other information, shows that, through May 6, 2024, Burkhalter and Drive Planning, with the assistance of sales agents such as Bruce, raised more than $336 million from more than 2,000 investors in at least 48 U.S. states, as well as other countries, with $66.9 million of that amount coming from retirement accounts.

18.     The above-referenced Spreadsheet was the only tool by which Drive Planning kept track of REAL investments. Drive Planning did not use accounting software, nor did it keep typical financial or accounting records.

19.     According to the Spreadsheet, Drive Planning paid $131 million of purported returns to investors. Based on the Spreadsheet, Drive Planning owes REAL investors $287,000,000, as of May 6, 2024. According to the SEC Staff Accountant Cody C. Turley, who reviewed the available bank records, those available bank records approximately match these values. The records show that Burkhalter and Drive Planning raised $372 million from investors and repaid investors $154.9 million from September 2020 through June 2024. SEC Staff Accountant Turley has also sworn in an affidavit in the SEC Action that from September 2020 through June 2024, the $372 million that was raised from investors came from more than 2,500 investors that invested funds in the REAL program at Drive Planning.

20.     Bank records show that Drive Planning transferred $65 million to Automatic Data Processing, Inc. ("ADP"), Drive Planning's payroll processor. While Drive Planning did have a few W2 employees whose salaries may be included in that figure, the vast majority of that amount was commission payments to sales agents.

21.     Because Drive Planning received only $17.6 million from sources other than REAL investors, at least $47.4 million of the above-mentioned $65 million in transfers to ADP must have been sourced from investor funds. For one recent two-week period, Drive Planning paid sales commissions of $1.92 million.

**Preserving Capital for the Scheme Through Rollovers**

22.     Drive Planning and the Defendants furthered the scam by prompting investors to roll over their REAL investments, including the supposed 10 percent return, at the end of the three-month term. Drive Planning did so by sending an email to investors at about day 60 of the 90-day term, asking whether investors wanted to make a withdrawal, roll over the supposed balance into a new 90-day investment, or add additional funds to the rollover investment.

23.     In connection with solicitation of an election to withdraw or roll over the investment, neither Drive Planning nor the Defendants herein ever disclosed that any withdrawal would necessarily be sourced not by a profit, but the principal invested by a later REAL investor, or that any interest credited was a phantom number and not the product of profitable use of the investors' funds.

24.     Drive Planning received $8.8 million in REAL investments in 2021, $63.2 million in 2022, $163.1 million in 2023, and $100.3 million in 2024 (through early May 2024).

25.     There was, however, no viable engine for generating the promised ten percent return. Bank records reveal that, contrary to what it represented to investors and prospective

investors, Drive Planning was not deploying the cash from REAL investments into bridge loans to developers or joint ventures with developers.

26.     Unbeknownst to investors, Drive Planning did not receive substantial income from loans to or joint ventures with property developers. Rather, Drive Planning's revenue sources were limited to commissions earned on life insurance sales, membership fees (ranging from $2,000 to $5,000) from clients who received financial planning services, and rental income from a few properties.

27.     From September 1, 2020, to June 2024, Drive Planning's main accounts received deposits of $389.6 million. Of these deposits, at least $372 million (95.4%) were received from investors in the REAL program. During this same period, Drive Planning only received funds totaling $17.6 million from other sources, with $4 million of that from other investment programs Drive Planning was running.

**Ponzi Scheme Payouts**

28.     Based on the bank records, from September 1, 2020 to June 2024, investors received "returns" of $154.9 million. With $372 million of REAL investor funds but only $17.6 million of potential non-REAL investor funds available, at least approximately $137.2 million of the "returns" were Ponzi payments, sourced from investor funds.

29.     Without new investor funds, Drive Planning would not have been able to meet its repayment obligations. For example, in May of 2022, Drive Planning received investor deposits of $3.3 million and non-investor deposits of $41,311 yet paid out $518,874 to investors. In September of 2023, Drive Planning accounts received investor deposits of $16.8 million and non-investor deposits of $270,104 yet paid out $7.1 million to investors.

30.     Since September of 2021, Drive Planning does not appear to have been able to generate enough non-investor funds to repay investors. Based on its purported collateral and historical cash flows, Drive Planning was unable to generate future revenue sufficient to pay its investors without inducing new investors to invest.

31.     On June 10, 2024, Drive Planning was forced by the bank to cease accepting new investments in REAL, and to cease paying commissions or paying supposed returns to investors, he nevertheless paid sales commissions to Drive Planning sales agents, including Bruce, until at least June 21, 2024. Defendants were last paid sales commissions on June 14, 2024; in total Defendants were paid over $1,900,000 in commissions from Drive Planning.

**Defendants' Acts in Furtherance of the Scheme:**

32.     As a sales representative trained and contracted by Drive Planning, Bruce provided potential investors, including Plaintiff, with a detailed presentation that included a chart indicating projected returns from proposed REAL investments with Drive Planning. A copy of the presentation is attached hereto as **Exhibit A**.

33.     Investments in REAL were and are "securities," as defined by federal securities law.

34.     On behalf of Burkhalter and Drive Planning, Bruce and SDWC offered the REAL investments for sale nationwide and accepted investments from international investors. The REAL brochure was promoted to prospective investors through the U.S. mail, by emailing it as a Portable Document Format (PDF), by reproducing it on the Drive Planning website (www.driveplanning.com), by handing it directly to prospective investors during in-person sales presentations, and by making hard copies available to Drive Planning's sales agents.

35.     Burkhalter recruited SDWC and Bruce to sell REAL to prospective investors by claiming that Drive Planning would pool their money and loan it out to property developers, and/or enter into joint ventures with property developers, and thereby generate the profit necessary to meet obligations to REAL said prospective investors.

36.     The interest from property developers in doing business with Drive Planning, however, proved insufficient, and Drive Planning had no other profit-generating enterprises sufficient to meet obligations to REAL investors, each of whom expected a ten percent return every 90 days. In fact, Drive Planning did not have any legitimate profitable enterprise capable of generating the sums necessary to pay the promised 10 percent returns every three months. Instead, in classic Ponzi fashion, Burkhalter used money from new investors to pay the supposed "returns" to existing investors and to maintain a luxurious lifestyle.

37.     Defendants distributed Drive Planning's marketing materials and promoted the REAL investments without conducting any due diligence to confirm that returns promised to investors were actually being paid from proceeds identified on the marketing materials.

38.     Even after they were made aware of the SEC Action, Defendants continued to reassure investors, including Hauger, that any pause in distributions was temporary, and that they would be protected. In response to specific inquiries from Plaintiff Hauger about the pause, Defendant Bruce repeatedly assured him that the SEC would protect investors and that she assumed everything would be okay.

39.     At the time Defendant Bruce made these assurances, she had no basis for assuming everything would be okay or that investors would be protected. In fact, in July 2024, unbeknownst to Plaintiff Hauger, Defendant Bruce emailed Burkhalter to inquire as to what was

going on, and noted in the email that though she had sought answers previously, she had yet to receive a response.

40.     At the time Defendant Bruce presented Exhibit A, she told Plaintiff Hauger that all investors' investments were backed with $95,000,000 in assets. Defendant Bruce said she had learned this information at the most recent in-person annual DRIVE meeting she attended.

41.     Defendant Bruce told Plaintiff Hauger that Drive Planning had security measures in place to protect all investors' investments.

**Defendants, who were not licensed to sell securities, solicited Plaintiffs to Invest in Unregistered Securities**

42.     In or around July 2023, Defendants induced Plaintiff Hauger to invest in REAL agreements. On July 24, 2023, Hauger signed a REAL agreement in which he loaned a principle sum of $30,000 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three month period. The agreement states that a new note is not required for each new three-month period. The agreement contains an assurance that the note is to be secured by real property located in Drive Planning Portfolio Properties, until the loan was paid back in full. Defendant Bruce told Plaintiff Hauger on July 28, 2023 that all promissory notes were backed by land DRIVE currently owns and "[w]hen they buy more land, they can intake more investments." The agreement was signed by Burkhalter, CEO, Drive Planning. A copy of the July 24, 2023 loan agreement is attached hereto as **Exhibit B.**

43.     On August 24, 2023, at the behest of Defendants, Plaintiff Hauger signed a REAL agreement in which he loaned a principal sum of $87,963 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part

of that amount at the same or current rate for another three month period. The agreement contained an assurance that the note is to be secured by real property located in Drive Planning Portfolio Properties, until the loan was paid back in full. The agreement was signed by Burkhalter, CEO, Drive Planning. A copy of the August 24, 2023 loan agreement is attached hereto as **Exhibit C.**

44.     On September 21, 2023, at the behest of Defendants, Plaintiff Hauger signed a REAL agreement in which he loaned a principal sum of $13,879.23 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three month period. The amount corresponds to a ROTH IRA with American IRA that Hauger cashed out for purposes of investing in REAL. The agreement contained an assurance that the note is to be secured by real property located in Drive Planning Portfolio Properties, until the loan was paid back in full. The agreement was signed by Burkhalter, CEO, Drive Planning. A copy of the September 21, 2023 loan agreement is attached hereto as **Exhibit D.**

45.     On September 22, 2023, at the behest of Defendants, Plaintiff Hauger signed a REAL agreement in which he loaned a principal sum of $48,832 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three month period. The agreement contained an assurance that the note is to be secured by real property located in Drive Planning Portfolio Properties, until the loan was paid back in full. The agreement was signed by Burkhalter, CEO, Drive Planning. A copy of the September 22, 2023 loan agreement is attached hereto as **Exhibit E.**

46.     On October 20, 2023, at the behest of Defendants, Plaintiff Hauger signed a REAL agreement in which he loaned $49,000 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three-month period. The source of these funds was the $30,000 principal from Exhibit B plus $3,000 in supposed interest derived from said promissory note plus $16,000 contributed by Plaintiff Hauger. The agreement contained an assurance that the note is to be secured by real property located in Drive Planning Portfolio Properties, until the loan was paid back in full. The agreement was signed by Burkhalter, CEO, Drive Planning. A copy of the October 20, 2023 loan agreement is attached hereto as **Exhibit F.**

47.     On January 25, 2024, at the behest of Defendants, Plaintiff Hauger signed a REAL agreement in which he loaned a principal sum of $190,000 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three month period. The amount corresponds to Hauger's mortgage on his primary home. The agreement contained an assurance that the note is to be secured by real property located in Drive Planning Portfolio Properties, until the loan was paid back in full. The agreement was signed by Burkhalter, CEO, Drive Planning. A copy of the January 25, 2024 loan agreement is attached hereto as **Exhibit G.**

48.     On May 22, 2024, at the behest of Defendants, Plaintiff Hauger signed a REAL agreement in which he loaned a principal sum of $48,823 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three-month period. The agreement contained an assurance that the note is to be secured by real property located in Drive Planning Portfolio Properties, until the loan was paid back in full. The agreement was signed by

Burkhalter, CEO, Drive Planning. A copy of the May 22, 2024 loan agreement is attached hereto as **Exhibit H.**

49.    On June 11, 2024, at the behest of Defendants, Plaintiff Hauger wired $6,500 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three-month period. Plaintiff Hauger never received any documentation for this payment.  A copy of the wire transfer receipt is attached hereto as **Exhibit I.**

50.    On or about June 11, 2024, Defendant Bruce told Plaintiff Hauger that the money needed to be wired immediately because Drive Planning would stop taking investments for a period of time.

51.    On or about June 11, 2024, Defendant Bruce told Plaintiff Hauger that the promissory note associated with Exhibit I would be coming omitting the fact that DRIVE's bank account had already been frozen.

52.    As of the date of this filing, Plaintiff Hauger has not yet received a promissory note associated with Exhibit I.

53.    Each of the Drive Planning REAL agreements, aka promissory notes, are in actuality "securities" under state and federal securities laws.

54.    Defendants were not registered to sell securities and omitted this information when selling to Plaintiff Hauger. Defendants lacked any Series 7 general securities representative license, were not registered representatives under Financial Regulatory Authority rules, or were not licensed as an investment advisor with the SEC.

55.    The REAL agreements, aka promissory notes, were sold in a private offering, which did not qualify as an exempt offering under SEC regulations.

56.     The REAL agreements, aka promissory notes, were not sold on any national securities exchange.

57.     On June 24, 2024, Burkhalter sent an email to Defendants and other agents representing Drive Planning in promoting and selling REAL investments informing them that Drive Planning was under scrutiny by the U.S. government and asking them all to be patient. Bruce forwarded the email to her clients, including Hauger, who had already expressed concern that he was not receiving promised updates regarding his REAL investments. A copy of the text message communications between Plaintiff Hauger and Defendant Bruce is attached hereto as **EXHIBIT J**.

58.     On June 25, 2024, Plaintiff Hauger read the email from Burkhalter, and expressed concern to Defendant Bruce, saying his wife was in a panic. Exhibit J at 33. Though Defendant Bruce continued to reassure Hauger, she had not received any information or guidance from Burkhalter.

59.     On July 23, 2024, Burkhalter sent an email to Defendants and other agents representing Drive Planning in promoting and selling REAL investments informing them that the SEC had requested that they pause selling assets and making distributions and stating that they were working to expedite the matter to a positive conclusion. There were no details in the email as to how they were doing so. A copy of the July 23, 2024 email is attached hereto as **EXHIBIT K.**

60.     On July 23, 2024, Defendant Bruce sent an email to Plaintiff Hauger assuring him that the Securities and Exchange Commission (referred to as the "this agency") appeared to be committed to protecting investors in Drive Planning REAL investments. Exhibit J at 35.

61.    On August 6, 2024, in a text exchange during which Plaintiff Hauger noted he had not received a renewal notice that was due, Defendant Bruce reassured him that she assumed everything would be okay. *See* Exhibit J at 35.

62.    On August 14, 2024, Plaintiff Hauger sent a text Defendant Bruce to tell her he had read the article about the SEC Action. Exhibit J at 36.  Defendant Bruce has yet to respond.

**Orders Granting Motion to Appoint Receiver and Motion for Preliminary Injunctive Relief**

63.  On August 13, 2024, the United States District Court for the Northern District of Georgia granted the SEC's Motions to Appoint a Receiver and for Preliminary Injunctive and other Equitable Relief against Drive Planning and Burkhalter. The Court found that:

> The appointment of a receiver was necessary and that the SEC had established a prima facie case that Drive Planning and Burkhalter had engaged in and, unless restrained and enjoined by order of this Court, will continue to engage in acts, practices, and courses of business constituting violations of Section 17(a) of the Securities Act [15 U.S.C. §17q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

*See SEC v. Drive Planning, LLC and Russell Todd Burkhalter,* ORDER, No. 1-24-03583 (N.D. GA, August 13, 2024).

## CLASS ALLEGATIONS

64.    Plaintiff brings his claims on behalf of himself and the following plaintiffs: All individuals who invested in DRIVE PLANNING LLC through SDWC or its agents or principals, or MEREDITH BRUCE or her agents or anyone authorized to act on her behalf.

65.    Excluded from the proposed Class and subclasses are judicial officers, the court appointed receiver Defendants, and their respective officers, directors, employees, affiliates, legal

representatives, heirs, successors, or assignees. Plaintiff reserves the right to amend the Class definition as necessary.

66.     Certification of the Class is appropriate and warranted under Federal Rule of Civil Procedure 23.

67.  The members of the Class are so numerous that separate joinder of each member is impracticable. On good faith information and belief, there at least 40 clients of Defendants who were solicited to invest in the REAL program at Drive Planning. Although the total number of Class members and their names are presently unknown, this information can be readily determined from Drive Planning's records and SEC filings and associated documents.

68.  Plaintiff's contentions raise predominantly questions of law or fact common to each member of the Class. These common legal and factual questions include, but are not limited to, the following:

(A) whether Defendants violated § 12(a)(2) of the Securities Act;

(B) whether Defendants violated § 12(a)(1) of the Securities Act;

(B) whether Defendants committed negligent misrepresentation;

(C) whether Defendants committed common law fraud;

(D) whether Defendants violated the Georgia Securities Act;

(E) whether Defendants breached their fiduciary duty to Plaintiff and the Class;

(F) whether Defendants committed professional negligence; and

(G) whether Plaintiff and Class members are entitled to a claim for unjust enrichment or other equitable relief.

69. Plaintiff's claims are typical of the claim of each member of the Class, because, *inter alia*, all Class members were injured through the misconduct alleged herein. Plaintiff is

advancing the same claim and legal theories on behalf of herself and all members of the Class.

70. Plaintiff will fairly and adequately protect and represent the interests of each member of the Class. Plaintiff is willing and prepared to serve the Court and the Class in a representative capacity with all of the obligations and duties material thereto. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex securities class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class.

71. The questions of law or fact common to the claim of each member of the Class predominate over any question of law or fact affecting only individual members of the Class.

72. Finally, class representation is superior to other available methods for the fair and efficient adjudication of the controversy. In particular:

A) there is little economic incentive or other interest of Class members to

individually prosecute separate claims

(B) Plaintiff is unaware of any other pending litigation to which any member of the Class is a party and in which any question of law or fact controverted in the subject action is to be adjudicated

(C) it is certainly desirable to concentrate this litigation in Defendants' home forum, where a receiver can be appointed and

(D) there appears no difficulties likely to be encountered in the management of the claim or defense on behalf of the Class.

(E) Judicial determination of the common legal and factual issues essential to this case would thus be far more efficient and economical as a class action than in piecemeal individual determinations.

## V.    CLAIMS

### COUNT I
### Violation of Section 12(a)(2) of the Securities Act of 1933
### [Against all Defendants]

73.    Plaintiffs restate and reallege paragraphs 1 through 72 as though fully set forth herein as paragraph 73.

74.    For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Section 12(a)(2)(15 U.S.C. § 77l) claims under the Securities Act of 1933, as amended (Securities Act).

75.    Defendants SDWC and Bruce were each a seller, offeror, and/or solicitor of sale of the REAL agreements to encourage and facilitate investment in the Drive Planning investment vehicle under Section 12(a)(2) of the Securities Act and pertinent common law.

76.    Defendants offered, sold, and/or solicited a security, namely the REAL agreements, by and through making untrue and/or misleading statements of material fact that, in his exercise of reasonable care, they should have known were false.

77.    Defendants solicited Plaintiffs in person, over the telephone, through the mail, and through email.

78.    Defendants actively solicited the sale of Drive Planning's REAL agreements to serve the interests of Drive Planning, its founder, and themselves.

79.    Neither Plaintiffs nor Defendants had access to the type of information normally provided in a prospectus of a SEC registration statement such as Form S-1.

80.     At the time they invested in the REAL agreements, Plaintiffs did not know that the representations made to them by Defendants were untrue and did not know that material facts described above were undisclosed.

81.     Plaintiffs did not know, or in the exercise of due diligence could not have known of the untruths and omissions committed by Defendants.

WHEREFORE, Plaintiff respectfully request that the Court enter judgment against Defendants SDWC and Bruce on behalf of Plaintiff and the class and award compensatory damages in an amount in excess of $5,000,000 and grant any and all further relief that the Court deems necessary or appropriate.

## COUNT II
### Violation of Section 12(a)(1) of the Securities Act of 1933
### [Against all Defendants]

82.     Plaintiffs restate and reallege paragraphs 1 through 72 as though fully set forth herein.

83.     For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability under the Securities Act.

84.     Defendants SDWC and Bruce were each a seller, offeror, and/or solicitor of sale of the REAL agreements to encourage and facilitate investment in the Drive Planning investment vehicle under Section 12(a)(1) of the Securities Act and pertinent common law.

85.     Defendants offered, sold, and/or solicited a security, namely the REAL agreements, by and through making untrue and/or misleading statements of material fact that, in his exercise of reasonable care, they should have known were false.

86.     Defendants offered, sold, and/or solicited a security, namely the REAL agreements within the last one year.

87.     Defendants solicited Plaintiffs in person, over the telephone, through the mail, and through email.

88.     Defendants actively solicited the sale of Drive Planning's REAL agreements to serve the interests of Drive Planning, its founder, and themselves.

89.     Neither Plaintiffs nor Defendants had access to the type of information normally provided in a prospectus of a SEC registration statement such as Form S-1.

90.     At the time they invested in the REAL agreements, Plaintiffs did not know that the representations made to them by Defendants were untrue and did not know that material facts described above were undisclosed.

91.     On or about May 22, 2024, Defendants sold Plaintiff Hauger a REAL agreement for $48,823. (Exhibit H)

92.     Plaintiffs did not know, or in the exercise of due diligence could not have known of the untruths and omissions committed by Defendants.

WHEREFORE, Plaintiff respectfully request that the Court enter judgment against Defendants SDWC and Bruce on behalf of Plaintiff and the class and award compensatory damages in an amount in excess of $5,000,000 and grant any and all further relief that the Court deems necessary or appropriate.

**COUNT III**
**Negligent Misrepresentation**
**[Against all Defendants]**

20

93.     Plaintiffs restate and realleges paragraphs 1 through 72 as though fully set forth herein.

94.     To induce Plaintiffs to invest in REAL, Defendants negligently and carelessly made material misrepresentations and omissions as described in detail above.

95.     Defendants were negligent and/or careless in ascertaining the truth of the statements made to Plaintiffs and/or they were negligent and/or careless in omitting material facts in statements made to Plaintiffs when inducing them to enter into the REAL agreements.

96.     Defendants made such negligent and careless misrepresentations and omissions for the purpose of inducing Plaintiffs to invest in the Notes.

97.     Investments in REAL were and are "securities," as defined by federal securities law.

98.     As sellers of securities, Defendants had a duty to communicate accurate information to Plaintiffs and not misrepresent information. Plaintiffs relied on Defendants to provide them with accurate information.

99.     Defendants are in the business of supplying information for the guidance of others in their business transactions.

100.     Plaintiffs justifiably relied upon the negligent and careless misrepresentations and omissions of Defendants, as described herein.

101.     If Plaintiffs had known the truth, they would not have invested in the REAL agreements with Drive Planning.

102.     Defendants' conduct amounts to malice or gross negligence indicating a wanton disregard for Plaintiffs' rights.

WHEREFORE, Plaintiff respectfully requests entry of Judgment in his favor and on behalf of the class and against Defendants as follows:

a. Damages in excess of $5,000,000;
b. Punitive damages in amount sufficient to punish Defendants' willful and wanton conduct and deter others similarly situated from engaging in such conduct;
c. Interest;
d. Costs of suit; and
e. Such other and further relief as the Court deems just and proper.
a.

## COUNT IV
## Breach Of Fiduciary Duty
## [Against All Defendants]

103.    Plaintiff restates and realleges paragraphs 1 through 72 as though fully set forth herein.

104.    Defendants held themselves out as financial advisors with superior knowledge and experience in investments.

105.    Under the common law and Restatement of Agency 425, agents employed to make, manage, or advise on investments such as Defendants have a fiduciary obligation to their customers.

106.    By virtue of their roles as de facto financial advisors, de facto broker-dealers, de facto brokers aka financial advisors, aka registered representatives, aka financial consultants, aka investment advisors, and/or de facto private placement agents, Defendants owed fiduciary duties to Plaintiffs, including the duties of loyalty, good-faith, care, full and fair disclosure and duty to:

a. Provide investment advice in Plaintiffs' best interests generally, and under the SEC's Regulation Best Interests (aka Reg BI);

b. Refrain from engaging in activities that conflict with Plaintiffs' interest;

c. Make full and fair disclosure of conflicts of interest to the extent they cannot be avoided;

    d.  Provide reasonably available alternative investments;

    e.  Investigate Drive Planning before recommending any investment concerning Drive Planning.

    f.  Recommend investments only after studying them sufficiently to become informed as to their nature, price, and financial prognosis;

    g.  Perform the customer's orders promptly in a manner best suited to serve the customer's interests;

    h.  Inform the customer of the risks involved in purchasing or selling a particular security;

    i.  Refrain from self-dealing; and

    j.  Not to misrepresent any material fact to the transaction.

107.    Defendants breached the fiduciary duties they owed to Plaintiffs by:

    a.  Negligently misrepresenting and omitting the true nature of the investments;

    b.  Negligently misrepresenting the true value of the investments;

    c.  Failing to disclose that they failed to reasonably investigate the REAL investments, including claims made by the issuer, Drive Planning, including but not limited to claims in Drive Planning's brochures and other promotional materials regarding the source of promised proceeds, and claims made by Drive Planning's principal, Todd Burkhalter, as required of financial advisors and professionals in recommending investments; and

    d.  Other breaches of fiduciary duty as described herein.

108.    Defendants' breach of fiduciary duties caused injury and damages to Plaintiffs.

109.    As a direct or proximate result of Defendants' breaches, Plaintiffs have suffered

damages which consist of investment losses in excess of $5,000,000.

WHEREFORE Plaintiff respectfully requests entry of Judgment in his favor and on behalf of the class and against Defendants as follows:

a.  Compensatory damages in excess of $5,000,000;
b.  Disgorging from Defendants any fees, commissions or other compensation that they received in connection with causing Plaintiffs to enter into the REAL agreements.
c.  Awarding Plaintiffs their costs and expenses incurred in this action;
d.  Awarding Plaintiffs punitive damages in an amount sufficient to deter similar misconduct in the future; and
e.  Awarding Plaintiffs such other and further relief as is appropriate.

## COUNT V
## Professional Negligence
## [Against Bruce]

110.    Plaintiffs restate and reallege paragraphs 1 through 72 as though fully set forth

herein.

111.    Investment advisors, broker-dealers and private placement agents such as

Defendants must possess and use the knowledge, skill, and care ordinarily used by reasonably

careful investment advisors, broker-dealers, and private placement agents.

112.    Defendants owed Plaintiffs all such duties.

113.    Defendants deviated from that standard and breached those duties by failing to

properly investigate the claims made in promotional materials for Driver Planning's investment

vehicle for all the reasons and in all the ways alleged above.

114.    Defendants' breaches have caused injury and damages to Plaintiffs.

115.    As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered

damages which consist of investment losses in excess of $5,000,000.

WHEREFORE Plaintiff respectfully requests entry of Judgment in his favor and on behalf of the class and against Defendants as follows:

1. Compensatory damages in excess of $5,000,000;
2. Plaintiffs' costs and expenses in this action;  and
3. Such other and further relief as is appropriate.


**COUNT VI**
**Violations of The Georgia Uniform Securities Act**
**GA Code Ch. 5 §§ 10-5-1 — 10-5-108**
**[Against All Defendants]**

116.    Plaintiff restates and realleges paragraphs 1 through 72 as though fully set forth herein.

117.    An "agent" under section 10-5-2 of the Georgia Uniform Securities Act means an individual, other than a broker-dealer, who represents a broker-dealer in effecting or attempting to effect purchases or sales of securities or who represents an issuer in effecting or attempting to effect purchases or sales of the issuer's securities. A partner, officer, or director of a broker-dealer or issuer or an individual having a similar status or performing similar functions may be an agent if the individual performs the duties of an agent. This term does not include an individual excluded by rule adopted or order issued under this chapter.

118.    Defendants acted as unregistered agents doing business in Georgia with both actual and apparent authority to solicit or effect purchases of Drive Planning investments.

119.    A "broker-dealer" under section 10-5-2 of the Georgia Uniform Securities Act means a person engaged in the business of effecting transactions in securities for the account of others or for the person's own account.

120.    Defendants acted as unregistered broker-dealers in offering Drive Planning investments.

121.    A "security" under section 10-5-2 of the Georgia Uniform Securities act means a note; stock; treasury stock; security future; bond; debenture; evidence of indebtedness; certificate of interest or participation in a profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; fractional undivided interest in oil, gas, or other mineral rights; put, call, straddle, option, or privilege on a security, certificate of deposit, or group or index of securities, including an interest therein or based on the value thereof; put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency; or, in general, an interest or instrument commonly known as a 'security'; or a certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing.

122.    The Drive Planning investments were unregistered securities, not exempt from registration, sold by unlicensed agents and broker-dealers like Defendants.

123.    The violations of the Georgia Uniform Securities Act as alleged in this action are violations by Defendants that give rise to a civil cause of action and remedies. Pursuant to Section 10-5-20, It is unlawful for a person to offer or sell a security in Georgia unless: the security is a federal covered security; the security, transaction or offer is exempted from registration; or the security is registered under Act.

124.    Pursuant to Section 10-5-58, a Defendant is liable to the purchaser if the Defendant sells a security in violation of Section 10-5-20, or, by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading, the purchaser not knowing the untruth or omission and the seller not sustaining the burden of proof that the seller

did not know and, in the exercise of reasonable care, could not have known of the untruth or omission. The purchaser may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney fees determined by the court.

WHEREFORE, Plaintiffs respectfully request entry of judgment in their favor and on behalf of the class and against Defendants, as follows:

a. Compensatory damages in an amount in excess of $5,000,000;
b. Prejudgment interest, at the maximum rate allowed under Georgia law;
c. Plaintiffs' attorneys' fees, costs, and expenses incurred in this action; and
d. Such other and further relief as this Court deems appropriate.

### COUNT VII
### Unjust Enrichment
### As an alternative to Counts I through VI
### [Against All Defendants]

125.    Plaintiff restates and realleges paragraphs 1 through 72 as though fully set forth herein.

126.    Through its unauthorized and continued use of Plaintiffs' funds, in the form of sales commissions and awards, Defendants have enjoyed and continue to enjoy an unjust benefit at the expense and to the detriment of Plaintiffs.

127.    Plaintiffs invested much of their life savings and retirement funds with Driver Planning, based upon Defendants' recommendations, with the reasonable expectation that the invested funds would be returned with interest.

128.    Defendants are unjustly reaping the benefits of Plaintiffs' money.

129.    Defendants' retention of Plaintiffs' money violates the fundamental principles of justice, equity and good conscience, which principles require that all such assets be turned over to Plaintiffs.

130.    Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiff respectfully requests entry of Judgment in his favor and on behalf of the class and against Defendants, as follows:

a. Restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unjust enrichment;
b. That Defendants be permanently enjoined and restrained from acting in any manner related to the acts giving rise to the harms alleged herein;
c. That Plaintiffs recover their costs of suit and reasonable attorneys fees; and
d. That the Court grant Plaintiffs such other and further relief as this Court deems appropriate.

Dated: May 27, 2025

Respectfully Submitted,

/s/ Brian B. Pastor
Brian B. Pastor, Esq.
GA Bar No. 565860
Attorney for Plaintiff BRIAN HAUGER, individually
and on behalf of all others similarly situated
Sonn Law Group PA
3455 Peachtree Rd NE, Ste. 500
Atlanta, GA 30326
Tel: 305-912-3000 Ext. 538  Fax: 404-738-1505
E-Mail: BPastor@SonnLaw.com

Ross M. Good, Esq. *Admitted Pro Hac Vice*
IL Bar No. 6312917 and FL Bar No. 0116405
Shawn M. Good Esq. *Admitted Pro Hac Vice*
IL Bar No. 632932
Attorneys for Plaintiff BRIAN HAUGER, individually
and on behalf of all others similarly situated
The Good Law Group
800 E. Northwest Hwy, Ste 814
Palatine, IL 60074
Ph: (847) 577-4476 Fax: (800) 709-1179

Ross@thegoodlawgroup.com
Shawn@thegoodlawgroup.com

Jeffrey Sonn, Esq. *Admitted Pro Hac Vice*
Attorney for Plaintiff BRIAN HAUGER, individually
and on behalf of all others similarly situated
FL Bar No. 773514
Sonn Law Group PA
19495 Biscayne Blvd Suite 607
Aventura, Fl 33180
Tel 305-912-3000
Fax 786-485-1501
Jsonn@Sonnlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Brian Pastor, certify that on this day of May 27, 2025, I caused the foregoing Amended

Complaint and Exhibits thereto to be served upon counsel of record for the parties by and

through the ECF System.


<u>/s/ Brian B. Pastor, Esq.</u>

Date: 05/27/2025