## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| BRIAN HAUGER, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Action No. 1:25-cv-01058-VMC |
| v. | |
| SDWC FINANCIAL, LLC, a Florida limited liability corporation, and MEREDITH BRUCE, a Georgia individual, | |
| Defendants. | |

## ORDER

The matter is before the Court on Defendants SDWC FINANCIAL, LLC

("SDWC") and Meredith Bruce's ("Bruce") Motion to Dismiss Amended

Complaint for Failure to State a Claim (Doc. 22) and Motion to Stay Proceedings.

(Doc. 29).

### I.    Background[1]

Plaintiff Brian Hauger brings this action on behalf of himself and a proposed

class of investors to recover funds misused, commingled, and stolen by Burkhalter

---

[1] Because this case is before the Court on Defendant's Motion to Dismiss, the following facts are drawn from Plaintiff's Amended Complaint and are accepted as true. *See Cooper v. Pate*, 378 U.S. 546, 546 (1964). Quotation marks are omitted from Amended Complaint excerpts to improve readability.

and Drive Planning on the direct recommendations of Defendants SDWC and Bruce. (Doc. 20 ¶ 4). Plaintiff alleges Defendants solicited him to invest in Real Estate Acceleration Loan ("REAL") agreements offered by Drive Planning, LLC ("Drive Planning") and its founder, Russell Todd Burkhalter ("Burkhalter"), from July 24, 2023, through June 11, 2024. (Doc. 20 ¶¶ 2-3; 42; 49).

A.    Related Actions

This case (the "Hauger Action") involves claims arising out of substantially the same subject matter and factual issues as a pending action filed by the Securities and Exchange Commission ("SEC") against Drive Planning and Burkhalter for originating and engaging in a $300 million Ponzi scheme that defrauded over 2,000 investors. (*Id.* ¶ 2). According to the SEC's complaint, filed in the U.S. District Court for the Northern District of Georgia, Drive Planning and Burkhalter lured investors with promises of lucrative returns through purported real estate investments which in reality were unregistered securities in the form of REAL agreements. *See Sec. & Exch. Comm'n v. Drive Plan., LLC*, No. 1:24-cv-3583-VMC (N.D. Ga, filed Aug. 13, 2024) (the "SEC Action"). (Doc. 20 ¶ 2).

On August 13, 2024, the Court granted the SEC's Motions to Appoint a Receiver and for Preliminary Injunctive and other Equitable Relief against Drive Planning and Burkhalter. The Court found that:

> The appointment of a receiver was necessary and that the SEC had established a prima facie case that Drive Planning and Burkhalter

had engaged in and, unless restrained and enjoined by order of this Court, will continue to engage in acts, practices, and courses of business constituting violations of Section 17(a) of the Securities Act [15 U.S.C. §17q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

(SEC Action, Dkt. No. 10) ("Receivership Order").

In addition, another related putative class action was filed in the Southern District of Indiana. *See* Order, *Williamson v. Linarducci*, No. 1:24-CV-01526-TWP-MJD, 2025 WL 2379272 (S.D. Ind. Aug. 15, 2025). Similar to the Plaintiff here, the plaintiffs in *Williamson* maintained that Defendants solicited them and other investors to invest in REAL agreements at non-party Drive Planning's instruction and, consequently, alleged violations of Section 12(a)(2) of the Securities Act of 1933 and various state law claims. *See id*. at *1. On August 15, 2025, the court granted Defendants' motion to dismiss with leave to amend the complaint on the grounds that Plaintiff failed to state a claim under Section 12(a)(2) because they did not "allege[] that there was a prospectus in the transaction at issue as the investments were sold in a 'private offer.'" *See id*. at *5.

Finally, on August 13, 2025, the Receiver filed suit against various individuals and entities, including SDWC and Bruce ("Receiver Suit"). Complaint, *Murena v. CQ Consulting Servs., LLC et al.*, No. 1:25-cv-04587 (N.D. Ga. Aug. 13, 2025). Through the Receiver Suit, the Receiver seeks, among other relief, return of commissions Drive Planning paid to entities such as Defendants. (*Id*.).

###### B.    Relevant Facts

###### 1. Overview of Ponzi Scheme

More than 2,000 investors from Georgia and elsewhere were victimized by a Ponzi scheme under which they were induced and encouraged to invest large sums of money with a promised return of ten percent interest every three months. (Doc. 20 ¶ 1). Investors were urged to use whatever money they had, including their savings, retirement accounts, 529 college plans, and open lines of credit to participate in what, unbeknownst to them, was a fraudulent scheme. (*Id.*). Defendants SDWC, a financial advisor/wealth management firm, and Meredith Bruce, a Senior Financial Analysis employed by SDWC, recommended that the Plaintiff and countless others invest in Drive Planning, ignoring their risk-tolerance and causing them to lose large sums of money. (*Id.* ¶ 3). Defendants were aware, or should have been aware, that their investors' money was unsecured, and that the investment vehicle was nothing more than a massive scheme to defraud. (*Id.*).

Burkhalter recruited SDWC and Bruce to sell REAL to prospective investors by claiming that Drive Planning would pool their money and loan it out to property developers, and/or enter into joint ventures with property developers, and thereby generate the profit necessary to meet obligations to REAL prospective investors. (*Id.* ¶ 35). On behalf of Burkhalter and Drive Planning, Bruce and SDWC

offered the REAL investments for sale nationwide and accepted investments from international investors. (*Id.* ¶ 34).

As a sales representative trained and contracted by Drive Planning, Bruce provided potential investors, including Plaintiff, with a detailed presentation that included a chart indicating projected returns from proposed REAL investments with Drive Planning. (*Id.* ¶ 32; Doc. 20-1). The interest from property developers in doing business with Drive Planning, however, proved insufficient, and Drive Planning had no other profit-generating enterprises sufficient to meet obligations to REAL investors, each of whom expected a ten percent return every 90 days. (Doc. 20 ¶ 36). In fact, Drive Planning did not have any legitimate profitable enterprise capable of generating the sums necessary to pay the promised 10 percent returns every three months. (*Id.*). Instead, in classic Ponzi fashion, Burkhalter used money from new investors to pay the supposed "returns" to existing investors and to maintain a luxurious lifestyle. (*Id.*).

Defendants distributed Drive Planning's marketing materials and promoted the REAL investments without conducting any due diligence to confirm that returns promised to investors were actually being paid from proceeds identified on the marketing materials. (*Id.* ¶ 37). Drive Planning's marketing materials included a REAL brochure, which was promoted to prospective investors through the U.S. mail, by emailing it as a Portable Document Format

(PDF), by reproducing it on the Drive Planning website (www.driveplanning.com), by handing it directly to prospective investors during in-person sales presentations, and by making hard copies available to Drive Planning's sales agents. (*Id*. ¶ 34; Doc. 20-1).

Even after they were made aware of the SEC Action, Defendants continued to reassure investors, including Hauger, that any pause in distributions was temporary, and that they would be protected. (Doc. 20 ¶ 38). In response to specific inquiries from Plaintiff Hauger about the pause, Defendant Bruce repeatedly assured him that the SEC would protect investors and that she assumed everything would be okay. (*Id*.). At the time Bruce made these assurances, she had no basis for assuming everything would be okay or that investors would be protected. (*Id*. ¶ 39). In fact, in July 2024, unbeknownst to Hauger, Bruce emailed Burkhalter to inquire as to what was going on, and noted in the email that though she had sought answers previously, she had yet to receive a response. (*Id*.). At the time Bruce presented Exhibit A, she told Hauger that all investors' investments were backed with $95,000,000 in assets. (*Id.* ¶ 40). Bruce also told Hauger that Drive Planning had security measures in place to protect all investors' investments. (*Id.* ¶ 41).

## 2. Hauger REAL Transaction Timeline

In or around July 2023, Defendants induced Hauger to invest in REAL agreements. (Doc. 20 ¶ 42). On July 24, 2023, Hauger signed a REAL agreement in which he loaned a principle sum of $30,000 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three-month period. (*Id*.). The agreement states that a new note is not required for each new three-month period. (*Id*.). The agreement contains an assurance that the note is to be secured by real property located in Drive Planning Portfolio Properties, until the loan was paid back in full. (*Id*.). Bruce told Hauger on July 28, 2023 that all promissory notes were backed by land DRIVE currently owns and "[w]hen they buy more land, they can intake more investments." (*Id*.). The agreement was signed by Burkhalter, CEO, Drive Planning. (*Id*.; Doc. 20-2).

On August 24, 2023, at the behest of Defendants, Hauger signed a REAL agreement in which he loaned a principal sum of $87,963 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three-month period. (Doc. 20 ¶ 43). The agreement contained an assurance that the note is to be secured by real property located in Drive Planning Portfolio

Properties, until the loan was paid back in full. (*Id*.). The agreement was signed by Burkhalter, CEO, Drive Planning. (Doc. 20-3).

On September 21, 2023, at the behest of Defendants, Hauger signed a REAL agreement in which he loaned a principal sum of $13,879.23 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three-month period. (Doc. 20 ¶ 44). The amount corresponds to a ROTH IRA with American IRA that Hauger cashed out for purposes of investing in REAL. (*Id*.). The agreement contained an assurance that the note is to be secured by real property located in Drive Planning Portfolio Properties, until the loan was paid back in full. (*Id*.). The agreement was signed by Burkhalter, CEO, Drive Planning. (*Id*.; Doc. 20-4).

On September 22, 2023, at the behest of Defendants, Hauger signed a REAL agreement in which he loaned a principal sum of $48,832 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three-month period. (Doc. 20 ¶ 45). The agreement contained an assurance that the note is to be secured by real property located in Drive Planning Portfolio Properties, until the loan was paid back in full. (*Id*.). The agreement was signed by Burkhalter, CEO, Drive Planning. (*Id*.; Doc. 20-5).

On October 20, 2023, at the behest of Defendants, Hauger signed a REAL agreement in which he loaned $49,000 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three-month period. (Doc. 20 ¶ 46). The source of these funds was the $30,000 principal from the July 24, 2003 note plus $3,000 in supposed interest derived from said promissory note plus $16,000 contributed by Hauger. (*Id.*). The agreement contained an assurance that the note is to be secured by real property located in Drive Planning Portfolio Properties, until the loan was paid back in full. (*Id.*). The agreement was signed by Burkhalter, CEO, Drive Planning. (*Id.*; Doc. 20-6).

On January 25, 2024, at the behest of Defendants, Hauger signed a REAL agreement in which he loaned a principal sum of $190,000 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three-month period. (Doc. 20 ¶ 47). The amount corresponds to Hauger's mortgage on his primary home. (*Id.*). The agreement contained an assurance that the note is to be secured by real property located in Drive Planning Portfolio Properties, until the loan was paid back in full. (*Id.*). The agreement was signed by Burkhalter, CEO, Drive Planning. (*Id.*; Doc. 20-7).

9

On May 22, 2024, at the behest of Defendants, Hauger signed a REAL agreement in which he loaned a principal sum of $48,823 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three-month period. (Doc. 20 ¶ 48). The agreement contained an assurance that the note is to be secured by real property located in Drive Planning Portfolio Properties, until the loan was paid back in full. (*Id.*). The agreement was signed by Burkhalter, CEO, Drive Planning. (*Id.*; Doc. 20-8).

On June 11, 2024, at the behest of Defendants, Hauger wired $6,500 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three-month period. (Doc. 20 ¶ 48). Hauger never received any documentation for this payment. (*Id.* ¶ 49; Doc. 20-9).

The same day or thereabouts, Bruce told Hauger that the money needed to be wired immediately because Drive Planning would stop taking investments for a period of time and the promissory note associated with that transfer would be coming omitting the fact that Drive Planning's bank account had already been frozen. (Doc. 20 ¶ 50-51). As of the date of this filing, Hauger has not yet received a promissory note associated with the June 11, 2024 transfer. (*Id.* ¶ 52).

On June 24, 2024, Burkhalter sent an email to Defendants and other agents representing Drive Planning in promoting and selling REAL investments informing them that Drive Planning was under scrutiny by the U.S. government and asking them all to be patient. Bruce forwarded the email to her clients, including Hauger, who had already expressed concern that he was not receiving promised updates regarding his REAL investments. (*Id.* ¶ 57; Doc. 20-10). On June 25, 2024, Hauger read the email from Burkhalter, and expressed concern to Bruce, saying his wife was in a panic. (Doc. 20 ¶ 58; Doc. 20-10 at 33). Though Bruce continued to reassure Hauger, she had not received any information or guidance from Burkhalter. (Doc. 20 ¶ 58).

On July 23, 2024, Burkhalter sent an email to Defendants and other agents representing Drive Planning in promoting and selling REAL investments informing them that the SEC had requested that they pause selling assets and making distributions and stating that they were working to expedite the matter to a positive conclusion. There were no details in the email as to how they were doing so. (*Id.* ¶ 59; Doc. 20-11). On July 23, 2024, Bruce sent an email to Hauger assuring him that the SEC (referred to as the "this agency") appeared to be committed to protecting investors in Drive Planning REAL investments. (Doc. 20 ¶ 60; Doc. 20-10 at 35).

On August 6, 2024, in a text exchange during which Hauger noted he had not received a renewal notice that was due, Bruce reassured him that she assumed everything would be okay. (Doc. 20 ¶ 61; Doc. 20-10 at 35). On August 14, 2024, Hauger sent a text Bruce to tell her he had read the article about the SEC Action. (Doc. 20 ¶ 62; Doc. 20-10 at 36). Bruce has yet to respond. (Doc. 20 ¶ 62).

Plaintiff asserts the following: Drive Planning REAL agreements, aka promissory notes, are in actuality "securities" under state and federal securities laws; Defendants were not registered to sell securities and omitted this information when selling to Hauger; Defendants lacked any Series 7 general securities representative license, were not registered representatives under Financial Regulatory Authority rules, or were not licensed as an investment advisor with the SEC; and the REAL agreements, aka promissory notes, were not sold on any national securities exchange, and, instead, were sold in a private offering, which did not qualify as an exempt offering under SEC regulations. (*Id.* ¶¶ 53-56).

Hauger brings claims for: 1) Violation of § 12(a)(2) of the Securities Act; 2) Violation of § 12(a)(1) of the Securities Act; 3) Negligent misrepresentation; 4) Common law fraud; 5) Violation of the Georgia Uniform Securities Act ("GUSA"); 6) Violation of fiduciary duty to Plaintiff and the Class; 7) Professional negligence; and 8) Unjust enrichment or other equitable relief. (*Id.* at 18–28).

## II.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For the purposes of a motion to dismiss, the court must accept all factual allegations in the complaint as true; however, the court is not bound to accept as true a legal conclusion couched as a factual allegation. "Accordingly, evaluation of a motion to dismiss requires two steps: (1) eliminate any allegations in the pleading that are merely legal conclusions, and (2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Ridgeline Cap. Partners, LLC v. MidCap Fin. Servs., LLC*, 340 F. Supp. 3d 1364, 1367 (N.D. Ga. 2018) (citing *Iqbal*, 556 U.S. at 679).

In addition to the 12(b)(6) requirements, at issue is whether Rule 9(b) applies to the Securities Act claims, which requires that, for complaints alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth: "(1) precisely what statements or omissions were made in which

documents or oral representations; (2) the time and place of each such statement

and the person responsible for making (or, in the case of omissions, not making)

them; (3) the content of such statements and the manner in which they misled the

plaintiff, and; (4) what the defendant obtained as a consequence of the fraud." *See*

*Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006). The "[f]ailure to

satisfy Rule 9(b) is a ground for dismissal of a complaint." *Corsello v. Lincare, Inc.*,

428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam).

### III.    Discussion

The Court first discusses Defendants' Motion to Stay and then turns to the

Motion to Dismiss.

### A.    Motion to Stay

Defendants argue that this case is stayed by Court's Receivership Order in

the SEC Action. The Court's Receivership Order stayed:

> [a]ll civil legal proceedings of any nature, including, but
> not limited to, bankruptcy proceedings, arbitration
> proceedings, foreclosure actions, default proceedings, or
> other actions of any nature involving: (a) the Receiver, in
> his capacity as Receiver; (b) any Receivership Property,
> wherever located; (c) the Receivership Defendant,
> including subsidiaries and partnerships; or, (d) the
> Receivership Defendant's past or present officers,
> directors, managers, agents, or general or limited
> partners sued for, or in connection with, any action taken
> by them while acting in such capacity of any nature,
> whether as plaintiff, defendant, third-party plaintiff,
> third-party defendant, or otherwise (such proceedings
> are hereinafter referred to as "Ancillary Proceedings").

(Receivership Order ¶ 32). Defendants argue that this case is a stayed Ancillary Proceeding because it involves "Receivership Property" under prong (b), the "Receivership Defendant" under prong (c), and the Receivership Defendant's "agents" sued in connection with an action in that capacity under prong (d). In response, Plaintiff argues that the case is not stayed under the Receivership Order, and alternatively argues the stay should be lifted.

This Court has jurisdiction to interpret its own Orders. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). Receivership orders should be interpreted to further "the interests of equity and of the efficient and orderly administration of the receivership *res*." *Sec. & Exch. Comm'n v. Complete Bus. Sols. Grp., Inc.*, No. 20-CV-81205-RAR, 2024 WL 5348580, at *13 (S.D. Fla. Dec. 16, 2024). Ultimately, the Court's "power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." *Sec. & Exch. Comm'n v. Torchia*, 922 F.3d 1307, 1316 (11th Cir. 2019) (quoting *Sec. & Exch. Comm'n v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986)).

The Court can readily conclude that this action does not "involve" Receivership Property because Plaintiff's cause of action stems from harm done directly to investors. The Court has already held in the SEC Action that the Receiver lacks standing to bring such claims, and by extension such claims are not property of the Receivership Estate. *Sec. & Exch. Comm'n v. Drive Plan.*, LLC, No.

1:24-CV-03583-VMC, 2025 WL 1827684, at *6–7 (N.D. Ga. July 2, 2025) ("Georgia district and bankruptcy courts, as well as the Eleventh Circuit, have found a bankruptcy trustee [and by extension a receiver] does not have standing to bring a claim based on harm to the estate's creditors instead of the debtor.") (quoting *In re Aliera Cos., Inc.*, 665 B.R. 468, 494 (Bankr. N.D. Ga. 2024)). That the Receiver Suit also targets Defendants does not impact the Court's conclusion because that suit seeks a return of commissions paid to Defendants, which is a separate injury from the harms to investors raised here.

Moreover, the fact that the harm at issue stems indirectly from the actions of Drive Planning, the Receivership Defendant, does not mean that this case "involves" Drive Planning to the extent that it must be stayed. Drive Planning is not a party to this case and the Receiver will not need to expend any estate resources defending it. *Cf. Fratelli Cosulich Unipessoal, S.A. v. Specialty Fuels Bunkering, LLC*, No. 13-CV-00545-KD-C, 2014 WL 2611547, at *5 (S.D. Ala. June 11, 2014) (explaining, in bankruptcy context, that "[t]he automatic stay will apply to non-debtors only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate.") (quoting *Ritchie Cap. Mgmt, L.L.C. v. Jeffries*, 653 F.3d 755, 762 (8th Cir. 2011)); *see also Bendall v. Lancer Mgmt. Grp., LLC*, 523 F. App'x 554, 557 (11th Cir. 2013) ("Given that a primary purpose of both receivership and bankruptcy proceedings is to promote the

16

efficient and orderly administration of estates for the benefit of creditors, we will apply cases from the analogous context of bankruptcy law, where instructive, due to limited case law in the receivership context."). In this respect, it is instructive that the Receiver has not sought a stay of this proceeding.[2]

Finally, the Court does not agree that this suit "involves" agents of Drive Planning sued for acts taken in that capacity. The examples of agents listed (officers, directors, managers, agents, or general or limited partners) indicate persons with authority to operate Drive Planning, not simply those persons acting for its benefit. Accordingly, the Court finds that at this preliminary stage of the proceedings, the Receivership Order does not stay the case.[3]

## B.    Motion to Dismiss

Having set forth the overarching legal standards, the Court now turns to the substance of Defendants' Motion and Plaintiff's opposition. (Docs. 22, 24, 28). This is a putative class action alleging securities fraud among other theories. Defendants move to dismiss the entire Amended Complaint for failure to state a claim. (Doc. 22). For the purpose of this Order, the Court focuses on Counts I and

---

[2] Because the Receiver has not been heard on this issue, this Order is without prejudice to the Receiver arguing that this matter was, or should, be stayed under the Receivership Order.

[3] Any argument about priority of the Receiver's claims over Plaintiff's claims is vastly premature at this stage.

II of Plaintiff's Complaint, because as the Court explains later, these are the only federal claims. In the Motion, Defendants argue that Count I and Count II should be dismissed for three reasons. (Doc. 22). First, Defendants argue Plaintiff fails to state a claim under Section 12(a)(2), 15 U.S.C. § 77l,[4] which targets certain sales of securities "by means of a prospectus or oral communication," because there was no prospectus. Second, Defendants argue Plaintiff's Section 12(a)(1) and 12(a)(2) claims fail to Satisfy Rule 9(b)'s heightened pleading standard. Third, Defendants argue Plaintiff's Section 12(a)(1) and 12(a)(2) claims fail because Plaintiff did not tender or offer to tender the REAL notes as required by Section 12.

### 1.    The Section 12(a)(2) Claim Fails Because There Was No Prospectus

The Court finds that Plaintiff's Section 12(a)(2) claim fails because he did not sufficiently allege that the misrepresentations and omissions related to the REAL agreements at issue were made by means of a prospectus. The Securities Act imposes liability when a security is sold "by means of a *prospectus* or oral communication" that contains a material misstatement or omission. 15 U.S.C. § 77l(a)(2) (emphasis added). Section 10 of the Securities Act says a prospectus must contain:

> (a) Information required in registration statement; documents not required. Except to the extent otherwise permitted or

---

[4] Citations to "Sections" refer to the Securities Act of 1933 as amended ("Securities Act") unless indicated otherwise.

> required pursuant to this subsection or subsections (c), (d), or (e) —
>
> (1) a prospectus relating to a security other than a security issued by a foreign government or political subdivision thereof, *shall contain the information contained in the registration statement*, but it need not include the documents referred to in paragraphs (28) to (32), inclusive, of schedule A [15 USCS § 77aa];

15 U.S.C. § 77j(a)(1). (emphasis added). The Supreme Court has held that "prospectus" is "a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 584 (1995). The Court further stated a prospectus document must generally include "information contained in a registration statement." *See id*. at 569.

Normally, "registration forms call for a description of the company's properties and business; a description of the security to be offered for sale; information about the management of the company; and financial statements certified by independent accountants." *See Williamson v. Linarducci*, No. 1:24-CV-01526-TWP-MJD, 2025 WL 2379272, at *6 (S.D. Ind. Aug. 15, 2025) (citation omitted). Other information required in a prospectus includes, "furnishing information on risk factors, ratio of earnings to fixed charges, the use of proceeds, determination of offering price, dilution, the selling security holders, the plan of distribution, a description of securities to be registered, and other information with respect to the registrant." *See id*. (citation omitted).

Plaintiff argues in his Response that the "public-facing REAL brochures . . . functionally serve as a prospectus." (Doc 24 at 7). The Court disagrees. First, the REAL brochures do not contain the information required in a prospectus per 15 U.S.C. § 77j(a)(1) ("[A] prospectus relating to a security other than a security issued by a foreign government or political subdivision thereof, shall contain the information contained in the registration statement."). Plaintiff concedes as much in his Amended Complaint. (*See* Doc. 20 ¶¶ 79, 89) ("Neither Plaintiffs nor Defendants had access to the type of information normally provided in a prospectus of a SEC registration statement such as Form S-1."). The REAL brochures did not contain a "substantial portion" of elements commonly featured in a registration form. *See Gustafson*, 513 U.S. at 583–84. Furthermore, courts have held that "marketing materials . . . are not a substitute for [a] required prospectus," and the Court finds these holdings persuasive. *See In re Edward D. Jones & Co., L.P. Sec. Litig.*, No. 2:18-CV-00714-JAM-AC, 2019 WL 2994486, at *8 (E.D. Cal. July 9, 2019) (denying plaintiffs' Section 12(a)(2) claim predicated on client pitch meetings, brochures, and other accompanying documents). The absence of a prospectus is fatal to Plaintiff's 12(a)(2) claim.

Even if the Court did find that the REAL brochures contained the information required for a prospectus, Plaintiff's 12(a)(2) claim would still fail because the securities at issue were sold in a private offering. (Doc. 20 ¶ 55) ("The

REAL agreements, aka promissory notes, were sold in a *private offering*, which did not qualify as an exempt offering under SEC regulations.") (emphasis added). The Supreme Court in *Gustafson* made clear that 12(a)(2) is inapplicable to private offerings. *See* 513 U.S. at 581 (holding "As to private transactions . . . there will never have been a registration statement. If § 12(2) liability was imposed here, it would cover transactions not within the contemplated reach of the statute."). Thus, Plaintiff's 12(a)(2) claim fails.

### 2.    Plaintiff Failed to Plead Falsity with Particularity

Second, Defendants argue that Plaintiff fails to plead sufficiently particularized facts establishing that certain challenged statements or omissions were false or misleading when made, as required by Rule 9(b). (Doc. 22). Plaintiff responds that his claims do not sound in fraud but instead sound in strict liability or negligence under Sections 12(a)(1) and 12(a)(2) of the Securities Act, and therefore the heightened pleading requirements do not apply. (Doc. 24). In support of his argument, Plaintiff points to the following excerpt in the Amended Complaint which reads: "Plaintiffs expressly exclude and disclaim any allegation that could be construed as fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Section 12(a)(2)(15 U.S.C. § 77l) claims under the Securities Act of 1933, as amended (Securities Act)." (Doc. 20 ¶ 74). But despite this conclusory disclaimer,

21

a close read of the Amended Complaint confirms that Plaintiff's complaint sounds in fraud, not strict liability or negligence.

The Eleventh Circuit has held that a "§ 12(a)(2) claim must be pled with particularity when the facts underlying the misrepresentation at stake in the claim are said to be part of a fraud claim, as alleged elsewhere in the complaint." *See Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1278 (11th Cir. 2006). In *Wagner*, plaintiffs brought a class action against First Horizon, a company that marketed and sold prescription drugs. *See id*. at 1275. Plaintiffs alleged that First Horizon engaged in a fraudulent scheme where it increased "more inventory into the supply chain and [] recognized more revenue without increased market demand for the product." *See id*. The court concluded that plaintiffs' § 12(a) claim was part of the predicate fraud for the Rule 10(b)(5) securities fraud claim because the misrepresentation at stake in the nonfraud claim was part of the principal fraud claim featured in the complaint. *See id*. at 1278. The court explained, "[I]f the plaintiffs are claiming that the [] § 12(a)(2) misrepresentation is part and parcel of a larger fraud, then the rule's protective purpose attaches, and plaintiffs must plead with particularity." *Id*. The court added, "Nor is it enough to present a general disclaimer in an attempt to immunize the nonfraud claims from the Rule 9 requirements . . . . The purpose of the rule is to protect a defendant's good will

22

and reputation when that defendant's conduct is alleged have been fraudulent."
*Id.*

In this case, Plaintiff attempts to disguise his fraud claims as "strict liability or negligence" claims by pronouncing that he "expressly exclude[s] and disclaim[s] any allegation that could be construed as fraud or intentional or reckless misconduct" for Counts I and II. (Doc. 20 ¶ 74; 83). Despite this broad disclaimer, Plaintiff's theory of liability is based on alleged false representations and misleading omissions that "induced" Plaintiff to purchase securities. (*See e.g.*, Doc. 20 ¶ 42) ("In or around July 2023, Defendants *induced* Hauger to invest in REAL agreements.") (emphasis added); (*see also id.* ¶ 68(c)) ("Plaintiff's contentions raise predominantly questions of law . . . These common legal and factual questions include . . . whether Defendants committed common law *fraud*.") (emphasis added). Plaintiff's statements disavowing any fraud claims are merely "general disclaimer[s]" that do not "save[] the nonfraud claims from making an allegation of fraud." *Wagner*, 464 F.3d at 1278. Therefore, the Court finds that Rule 9(b)'s particularity requirements apply to this case.

### 3.    Plaintiff's 12(a)(1) and 12(a)(2) Claims Fail to Meet Rule 9(b)'s Particularity Requirements

Since 9(b)'s particularity requirements apply to Plaintiff's 12(a) claims, the Court must determine whether the Amended Complaint specifies "the who, what, when[,] where, and how" of the statements at issue. *See Garfield v. NDC Health*

*Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006); *see also Barron v. Lampley,* No. 4:15-CV-0038-HLM, 2016 WL 5334472, at *5 (N.D. Ga. Jan. 25, 2016) (dismissing plaintiff's claims because plaintiff failed to "identify the specific statements they claim were misleading, who made them, when they were made, and why they were misleading."). A statement is misleading if, in the light of the facts that existed when the statement was made, a "reasonable investor, in the exercise of due care, would have been misled by it. Thus, the appropriate primary inquiry is into the meaning of the statement to the reasonable investor and its relationship to truth." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011).

The Plaintiff's Amended Complaint alleges the following:

- "Defendants distributed Drive Planning marketing materials and promoted the REAL loans without conducting any due diligence to confirm that returns promised to investors were actually being paid from proceeds identified on [Drive Planning's] marketing materials." (Doc. 20 ¶ 37).
- Defendant Bruce told "Plaintiff Hauger that all investors' investments were backed by $95,000,000 million in assets." (*Id.* ¶ 40).
- "Defendant Bruce told Plaintiff Hauger that Drive Planning had security measures in place to protect all investors' investments." (*Id.* ¶ 41).
- "Defendant Bruce told Plaintiff Hauger on July 28, 2023 that all promissory notes were backed by land DRIVE currently owns and "[w]hen they buy more land, they can intake more investments." (*Id.* ¶ 42).

However, Plaintiff fails to specify what statements were made, who made them, where they were made, how they were made, and why they were false at the time

24

they were made Without particularized allegations, the Court has no basis to determine the substance of the alleged fraud. In fact, Plaintiff's Amended Complaint does not refute Bruce's assertion that she was unaware of Drive Planning's fraudulent activity. (*See* Doc. 22-1 at 2) ("Plaintiff has filed this putative class action against Meredith Bruce, and outside salesperson who was herself duped into buying and selling Drive Planning investments." Therefore, Plaintiff's Amended Complaint falls below the 9(b) requirements and, accordingly, must be dismissed.

### 4. Plaintiff's Section 12 Fraud Claims Are Not Barred Because He Failed to Tender the REAL Notes to Defendants

Because the Court finds that there was no prospectus and the Amended Complaint does not adequately allege with particularity how any statements were false and misleading, it fails to state a claim for securities fraud and the Court need not continue its analysis. Yet for the sake of completion, the Court briefly addresses the Parties' arguments regarding the lack of tender or offer to tender the REAL notes.

The Supreme Court has held that Section 12(2) provides that a defrauded investor "may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, *upon the tender of such security*, or for

25

damages if he no longer owns the security." *Randall v. Loftsgaarden*, 478 U.S. 647, 655 (1986) (emphasis added). Plaintiff argues that tender should be excused because the securities were issued as part of a Ponzi scheme. While *Randall* indicated that a plaintiff need not tender the security if he does not own it, instead opting for damages rather than a return of consideration, it did not discuss the situation where the security was allegedly worthless because it was issued in furtherance of a fraud, scheme, or other artifice. Courts outside of the Eleventh Circuit have expressed doubt over whether tender should be required when it will not return the parties to status quo ante, but there is no binding authority on point. *Gardner v. Invs. Diversified Cap., Inc.*, 805 F. Supp. 874, 878 (D. Colo. 1992) (questioning what tender would accomplish when the defendant is without funds and bankrupt). To answer the question, the Court looks to the common law of fraud.

The Eleventh Circuit has indicated that courts "may only borrow from the common law of the states when it is consistent with the policies underlying the federal statute being applied." *Am. Mfg. Mut. Ins. Co. v. Tison Hog Mkt., Inc.*, 182 F.3d 1284, 1288 (11th Cir. 1999) (citing *Nachwalter v. Christie*, 805 F.2d 956, 959 (11th Cir. 1986)). The Supreme Court has observed that "Congress deliberately used 'fraud' and other common law terms of art in the Securities Act . . . [and] [i]n so doing, Congress incorporated prohibitions from common law fraud into federal

26

securities law." *Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 125 (2024) ("Congress's decision to draw upon common law fraud created an enduring link between federal securities fraud and its common law 'ancestor.'") (quoting *Foster v. Wilson*, 504 F.3d 1046, 1050 (9th Cir. 2007)). Therefore, it is appropriate to turn "to state common law . . . as a source for federal common law to fill the gap." *Tison Hog Mkt.*, 182 F.3d at 1288 (citing *Nachwalter*, 805 F.2d at 959).

In the state common law fraud context, the Eleventh Circuit has recognized an exception to the tender requirement when the restoration of the relevant consideration would be "unreasonable or impossible." *Vivid Invs., Inc. v. Best W. Inn--Forsyth, Ltd.*, 991 F.2d 690, 692 (11th Cir. 1993). Similarly, another judge in this district has held that "[n]o tender is required where the party seeking to rescind has received nothing of value or where any amount received under the contract may be less than the amount due to the party seeking to rescind." *PHL Variable Ins. Co. v. Jolly*, No. 1:08-CV-3220-GET, 2010 WL 11500513, at *3 (N.D. Ga. July 9, 2010) (citation omitted).

Here, the Court finds that the tendering of the REAL loans would be "unreasonable" because the Plaintiff has received nothing of value as the securities at issue were indisputably a "façade for a Ponzi scheme." (Doc. 21 at 5). Thus, the

Court holds that Plaintiff's failure to tender the REAL loans does not bar his Section 12 fraud claims.[5]

### 5.    The Court Grants Plaintiff's Request to Amend His 12(a)(1) and 12(a)(2) Claims.

In his Response, Plaintiff requested leave to amend his 12(a)(1) and 12(a)(2) pleadings. (Doc. 21 at 11). While asking for leave to amend in a response is not normally sufficient, according to the Federal Rules of Civil Procedure, a district court "should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1094 (11th Cir. 2017). Therefore, rather than dismissing the securities fraud claims, the Court will give Plaintiff one last opportunity to amend his Complaint to meet the 9(b) particularity requirements. If the Complaint is amended to cure the particularity deficiencies, the Court would be inclined to permit these counts, as well as any related state claims, to proceed.

---

[5] Moreover, Courts have held that Section 12(2) is silent as to the timing of tender. *Adair v. Hunt Int'l Res. Corp.*, 526 F. Supp. 736, 748 (N.D. Ill. 1981) (dismissing plaintiff's 12(2) claim with leave to amend to allege an offer of tender). And many courts have recognized that tender can occur as late as trial. *Gould v. Harris*, 929 F. Supp. 353, 360 (C.D. Cal. 1996), *abrogated on other grounds by Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076 (9th Cir. 1999) (citing *Jubran v. Musikahn Corp.*, 673 F. Supp. 108, 114 (E.D.N.Y. 1987)). Though the Court has held tender is unnecessary, to avoid issues down the line, Plaintiff may consider amending the Complaint to allege the willingness to tender anyway.

28

## IV.    Conclusion

For the reasons given above, it is **ORDERED** that Defendants' Motion to Dismiss the Amended Complaint. (Doc. 22) is **GRANTED**, but Plaintiff is given leave to amend. Plaintiff is **DIRECTED** to file an amended complaint within 14 days after the date of entry of this Order. Failure to comply with this direction will result in the Court dismissing the federal claims with prejudice and declining to exercise supplemental jurisdiction over the state law claims.

It is **FURTHER ORDERED** that the Motion to Stay (Doc. 29) is **DENIED**.

**SO ORDERED** this 3rd day of November, 2025.

Victoria Marie Calvert
United States District Judge